**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JEAN SZABO, | ) | CASE NO. 1:23-CV-01477-BYP |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | CARMEN E. HENDERSON |
| | ) | |
| Defendant, | ) | **REPORT & RECOMMENDATION** |
| | ) | |

### I. Introduction

Plaintiff, Jean Szabo ("Szabo" or "Claimant"), seeks judicial review of the final decision of the Commissioner of Social Security denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). For the reasons set forth below, it is RECOMMENDED that the Court OVERRULE Claimant's Statement of Errors and AFFIRM the Commissioner's decision.

### II. Procedural History

On November 16, 2017, Claimant filed applications for DIB and SSI, alleging a disability onset date of July 28, 2017. (ECF No. 7, PageID #: 46). On November 26, 2018, Claimant also filed an application for disabled widow's benefits, alleging the same disability onset date. (*Id.*). The applications were denied initially and upon reconsideration, and Claimant requested a hearing before an administrative law judge ("ALJ"). (*Id.*). On April 10, 2019, an ALJ held a hearing, during

1

which Claimant, represented by counsel, and an impartial vocational expert testified. (*Id.*). On May 28, 2019, the ALJ issued a written decision finding Claimant was not disabled. (*Id.* at PageID #: 46-59).  The Appeals Council declined further review on April 2, 2020, and Claimant filed an appeal with this Court. (*Id.* at PageID #: 32). On August 23, 2021, the Court reversed the Commissioner's decision and remanded the case for further proceedings. (*Id.* at PageID #: 1134-35).

Following the remand, the ALJ held a hearing on November 17, 2022 and a supplemental hearing on April 18, 2023, during which Claimant and an impartial vocational expert again testified. (*Id.* at PageID #: 951). On May 3, 2023, the ALJ issued another written decision finding that Claimant was not disabled. (*Id.* at PageID #: 951-90).

On July 28, 2023, Claimant filed her Complaint to challenge the Commissioner's final decision. (ECF No. 1). The parties have completed briefing in this case. (ECF Nos. 8-1, 11, 12). Claimant asserts the following assignments of error:

> (1) The ALJ erroneously failed to comply with the previous order of this Court when she failed to support her findings and conclusions with substantial evidence.
>
> (2) The ALJ erred at Step Two of the Sequential Evaluation when she failed to properly apply the criteria of Social Security Ruling 96-8p and consider all of Plaintiff's impairments and related limitations when forming the RFC.
>
> (3) The ALJ erred when she failed to find at Step Three of the Sequential Evaluation that Plaintiff satisfied or equaled the criteria of Listing 11.14.
>
> (4) The ALJ erred and her decision was not supported by substantial evidence when she failed to properly evaluate the opinions of the treating sources in accordance with 20 CFR 404.1520c and 416.920c.
>
> (5) The ALJ's RFC finding that Plaintiff could perform work at the light level of exertion was not supported by substantial evidence.

(ECF No. 8-1 at 1).

## III. Background

### A. Relevant Hearing Testimony

The ALJ summarized the relevant testimony from Claimant's hearing:

At the hearing in April of 2019, the claimant alleged that she is unable to sustain full time employment due to a combination of symptoms from her impairments including carpal tunnel syndrome; chronic pancreatitis; diabetes mellitus type II; neuropathy of hands and feet; difficulty remembering and concentrating; anxiety; depression; and arthritis in her thumbs (1E; Testimony). She testified that she has severe pain in her hands due to carpal tunnel syndrome and in her feet due to neuropathy, causing her to stay in her bed sick with pain many days (Testimony). She also testified that due to her hand condition she has difficulty gripping, especially with her right hand, explaining that she has trouble with pulling the laundry out of the machines, pulling up her pants, holding a dinner plate, using a broom, and brushing her teeth (3E; 1F/19; Testimony). She testified that she utilizes a shower chair and that her daughter helps bath her and wash her hair. The claimant stated that she does not do any of the household chores, does not help with shopping, and only occasionally cooks simple meals. The claimant testified that her hand/wrist braces are restrictive and cause her pain by putting pressure on the base of her thumb. She stated that she can stand for approximately 30 minutes before the pain in her feet is unbearable and she needs to rest for 30 minutes off of her feet. The claimant also testified that while she takes medication for her pain symptoms, the medication side effects make it difficult for her to think clearly and concentrate. She reported that thoughts come and go quickly causing her to not think clearly as a result of her medications. She also testified that she has problems with her memory explaining that, at times, she does not recall what she is doing or why she is doing something. However, she also testified that if she reduces her medication, her pain symptoms increase (Testimony, April 10, 2019).

The claimant's testimony at the hearing on November 17, 2022, was substantially similar to her prior testimony. She reported disability due to issues with using her right hand for grasping, holding, and fingering; significant pain in her back and wrist, and from her head to her toes (7- 8/10); medication not helping with pain; she has frequent diarrhea (4-5 times daily) and stomach pain; anxiety; frustration; depression; and feelings of worthlessness (Testimony, November 17, 2022). She made similar reports in a function report (3E).

She also notes that she is able to read about two e-books a week; (Testimony, November 17, 2022). She also noted that she has no issues with caring for her hair, shaving, feeding herself, or using the restroom; she takes care of her pets by feeding them (3E/3); she gets along "fine" with authority figures; she has never been laid off or fired due to issues getting along with others (3E/4); she is able to get around by driving and riding in car; she gets about 3 or 4 times a week; she is able to drive; she shops for food and medications; and she is able to pay bills, count change,

handle a savings account, and use a checkbook/money order (3E/8). The claimant reported that she was in regular and honors classes in school (18F/2). She has never been hospitalized for mental health issues. She has ongoing medication management but no counseling (18F/2).

(ECF No. 7, PageID #: 968-69).

## B. Relevant Medical Evidence

The ALJ also summarized Claimant's health records and symptoms:

The record supports that the claimant has experienced functional limitations related to carpal tunnel syndrome ("CTS"); osteoarthritis and allied disorders; degenerative disc disease of the spine; obesity; and trauma-/stressor-related disorder.

The claimant has a documented history of chronic pain in her extremities related to her carpal tunnel syndrome and osteoarthritis and allied disorders. The claimant has treated her chronic pain, chronic neuropathy, and carpal tunnel, and has followed with an endocrinologist and occupational therapy, but reports ongoing problems (1F/13; 6F; 7F; 8F; Testimony).

In November 2017, an x-ray of her right hand showed mild CMC thumb osteoarthritis, mild thumb osteoarthritis with post-traumatic changes (10F/598-599) and a physical exam revealed a positive Tinel's sign at carpal tunnel to ring finger and Durkan's sign was positive for the ring and middle fingers on her right hand (1F/6-7). After the physical exam on November 29, 2017, the claimant was diagnosed with right thumb osteoarthritis and right carpal tunnel syndrome (1F/8). At that point, carpal tunnel surgery was discussed including potential complications from her diabetes mellitus, the claimant was given a thumb brace, she was referred to occupational therapy, and she was given an injection of the CMC joint of the right thumb (1F/8).

The claimant continued to report pain in her extremities describing it as dull and continuous without weakness or arms or legs (6F: 7F: 8F). She followed up with the pain management clinic and stated in July and December 2018 that her medications were improving her ability to perform her activities of daily life, reporting a reduction of pain with the prescribed medication, Neurontin (7F/14, 194). The records indicate that the claimant was stable on her medication regimen in July 2018, with notes stating that "the medications reduce her pain to an acceptable level and allow her to remain functional with her daily activities" (7F/20).

She followed up in September 2018 for her right hand pain with the orthopedic doctor reporting numbness in all digits in her right hand and the ulnar 3 digits being worst (7F/71). She stated that the base of her thumb was the primary pain and the pain was worse with activity including grasping and twisting (7F/71). Upon

4

physical exam, Finkelstein's was positive, Tinel's sign at carpal tunnel was positive to thumb and palm, Durkan's sign was positive to all four digits, sensory exam was grossly decreased in her radial four digits, and Tinel's sign at Guyon's canal and cubital tunnel were both positive to the little finger (7F/73). The exam also showed she had full flexion range of motion in her fingers and thumb. She was diagnosed with right hand ulnar sided numbness and pain, clinically referred to as ulnar neuropathy; right thumb osteoarthritis: right de Quervain's tenosynovitis; and right carpal tunnel syndrome (7F/74). Surgical options were discussed, but the notes indicate that the doctor wants "to defer this until her HBA1C is better optimized" and also had concerns about the diffuse pain and the prognosis surgery might offer (7F/74). The claimant continued to wear her cool thumb brace and another referral for occupational therapy was given, and a second injection of the right carpal tunnel was performed (7F/74).

Additionally records from November 19, 2018 indicate that there is electrodiagnostic evidence of right median sensorimotor mononeuropathy at or distal to the wrist, moderate severity with demyelination in nature: there was no electrodiagnostic evidence of right ulnar mononeuropathy at the elbow or wrist, or of right cervical radiculopathy (7F/123). The records also show that there was no electrodiagnostic evidence of left carpal tunnel syndrome, left ulnar mononeuropathy or left cervical radiculopathy in November 2018 (7F/123).

The claimant followed up on her September 2018 occupational therapy referral on December 1, 2018 and reported ongoing symptoms in her ulnar digits and significant thumb pain (7F/143). The claimant indicated that she has home exercises to perform and she was given additional home exercise program exercises to perform on her own without further follow up with occupational therapy (7F/145). She followed up with the orthopedic doctor on December 3, 2018, for her right hand reporting the worst pain in her little finger and thumb (7F/150).

The claimant continued to report pain in her hands at her pain management appointment on December 18, 2018, but also reported that the medication regimen is improving her ability to perform her activities of daily living (7F/194). At this appointment she also denied numbness or tingling in her right hand, left hand, and right and left feet, and demonstrated 5/5 strength in all four extremities (7F/199). Overall, the notes indicate the claimant was stable with her medications and told to follow up in six months (7F/200).

Imaging of the claimant's fingers from September of 2019 showed mild to moderate degenerative joint disease in the CMC of the left hand (10F/464-465). Imaging of her right hand from September of 2019 showed early osteoarthritic changes in the 1st CMC joint (10F/462-464). Imaging of her feet from May of 2021, showed degenerative changes and heel spur. Imaging of her hands/wrists from that time was unremarkable (22F/11). Imaging of her feet from February of 2023, showed bilateral foot calcaneal spurring. Imaging of her lumbar spine showed L5/S1 disc space narrowing and facet changes, consistent with degenerative disc

disease (22F/11). EMG testing in 2018 showed mild CTS in the right and none in the left (16F/33).

At exam on March 4, 2019, her BMI was 34.58; her breathing and cardio signs were unremarkable; her extremities were unremarkable, including no edema or cyanosis; she had no tenderness throughout; there were no focal deficits; and a podiatric exam was unremarkable bilaterally (10F/157).

On April 19, 2019, her extremities were unremarkable (10F/147). On June 10, 2019, her exam was unremarkable, including normal sensation to monofilament testing on the feet and with 2+ pulses present (10F/133). On July 4, 2019, she had full range of motion in all four extremities; she had normal pulses throughout; she was alert and oriented; she was cooperative; and her affect was normal (10F/126). Aside from some abdominal tenderness, her exam was similarly unremarkable on July 18, 2019 (10F/120-121). Her exam was unremarkable October 7, 2019 (10F/89).

At exam on September 20, 2019, she had diffused finger and hand tenderness; her range of motion in the wrists and hands were normal; her sensation was decreased in the radial 4 digits; she had positive Tine's and Durkan's signs bilaterally; she had mild 4/5 thenar atrophy; her intrinsic motor strength was 5/5, with no atrophy; and her neck range of motion was 75% (10F/104). At a podiatric exam on March 3, 2020, she had reduced dorsalis pedis pulses at 1+ bilaterally, but she was otherwise unremarkable as to sensation and there were no gross motor deficits (10F/16).

On May 21, 2020, her gait was steady; her sensation and strength were symmetric and appropriate; she had full range of motion in all four extremities; she had no edema; her affect was normal; her eye contact was good; and she was cooperative (10F/9). At the consultative psychological exam on March 24, 2021, she walked into the room with an unremarkable gait and without any assistive device; and she wore braces on both wrists(18F/2-4).

At an in-person exam on October 28, 2021, she had limited active range of motion in the right shoulder with abduction; she had bilateral MCP and PIP distribution tenderness but no active synovitis; she had no tenderness or swelling in the bilateral MTP and IP, except for the 1st MP bilaterally; she had right thenar muscle group weakness; she had left mild weakness; and she had positive Tinel's sign on the right (19F/100).

On April 26, 2022, she underwent a right 1st extensor compartment release (20F/72). At exam on May 23, 2022, she reported improvement with the right wrist/thumb pain and range of motion following the procedure (20F/72). On exam, she had improved right thumb range of motion; she had severe left wrist tenderness (20F/72).

On June 10, 2022, she underwent an uncomplicated left wrist first extensor compartment release, for treatment of left de Quervain's tenosynovitis (20F/6). At a follow exam on July 14, 2022, her right upper extremity had improved range of motion; (20F/124).

On October 13, 2022, she reported arthralgias and joint swelling, and she denied any other symptoms (20F/189). On exam, she had swelling and tenderness in the hands and fingers, but normal range of motion; she had no focal deficits; she was fully oriented; and her mood and affect were normal (20F/188-189)

On October 31, 2022, she reported numbness and pain in the feet (21F/61). On exam, her sensation was intact bilaterally, with the exception of diminished vibratory sensation bilaterally; she had normal muscle strength with dorsiflexion; she had some limited range of motion in the 1st MPT joint due to pain and crepitus; and she otherwise had full range of motion without pain or crepitus bilaterally in the lower extremities (21F/62)

On November 3, 2020, in the right upper extremity, she had full active and passive range of motion in the wrist; she had full hand and finger flexion; she had tenderness at the base of the thumb CMC and volar STT with light touch; she had some decreased sensation in all fingers; and her thumb abduction was 4/5 (16F/32-33). Her left upper extremity had no atrophy, deformity, or swelling; she had some tenderness to palpation and the thumb CMC; with distraction she had no tenderness to palpation over the 3rd and 4th MC or dorsal SL; she had positive CMC grind testing; she had 4/5 strength with thumb flexion/extension; she had some altered sensation to the fingers; and she had negative Tinel's signs (16F/33).

On January 23, 2023, she denied joint swelling, mood issues, and all symptoms (21F/20). On exam, she had normal range of motion throughout; she had no focal deficits; her breathing and cardiovascular signs were unremarkable; she was fully oriented; and her mood was normal (21F/21).

At exam on April 6, 2023, she had some mild tenderness in the lumbosacral spine; low grade general tenderness in the wrists, hands, and fingers; no synovitis in the hands; some bony enlargement in the hands and in the first MTP bilaterally (feet); some reduced hand grasp strength (no rating); good range of motion in the hips and feet; negative straight leg raise testing; normal reflexes in the bilateral lower extremities; intact sensation in the bilateral lower extremities; some reduced range of motion in the shoulders; and full strength (5/5) in the lower extremities (22F/10-11).

There is no mention of cane use or ambulatory aid use throughout the record. In fact, her gait was consistently noted as within normal limits and "steady" (9F/10, 29, 49, 70, 93; 10F/9, 28, 94, 261, 280).

Additionally, the claimant is further limited by her obesity. Concerning the

claimant's obesity, the National Institute of Health (NIH) established medical criteria for the diagnosis of obesity classifying overweight and obesity in adults according to Body Mass Index (BMI), which is the ratio of an individual's weight in kilograms to the square of his or her height in meters. For adults, both men and women, the Clinical Guidelines describe a BMI of 25-29.9 as "overweight" and a BMI of 30.0 kg/m2 or above as "obesity." (See also Soc. Sec. Rul. 02-1p.) The records in this case reflect a BMI between 30-35 (7F/46, 109, 131, 160, 171, 235; 8F/13; 20F/108).

. . .

The record supports the claimant received specialized treatment, including psychiatric medication management and therapy.

In February 2018, the claimant attended a psychological consultative examination and denied being under the care of a mental health professional previously (4F/3). She also reported that she had been prescribed medications for emotional issues from her primary care physician and reported anxiety related to stressors from her medical conditions and worsening depression when she stopped working in 2017 (4F/3). At the exam she appeared depressed and exhibited some trouble remembering dates and times in her history, but was cooperative, persisted with good effort throughout the evaluation, understood proverbs, and could perform serial 7's (4F/3-4). She reported problems sleeping and difficulty with energy and motivation, but demonstrated good insight and judgment and stated that she can help with chores on a good day but that she mostly watches TV and surfs the internet (4F/5). After a mental status examination, Dr. Koricke diagnosed the claimant with adjustment disorder with mixed anxiety and depressed mood (4F/5).

The claimant followed up with a referral for mental health services and was seen on April 3, 2018 for a diagnostic assessment (6F/54-60). At that time, she reported feeling depressed for the past year explaining that she shuts down and spends 18 hours per day in bed (6F/56). The mental status exam notes indicate she had a sad and tearful affect, but was cooperative, demonstrated sustained concentration, logical, organized thought processes, and had good insight and judgment (6F/58-59). She was assessed with depressive features and mild anxious distress and recommended medication management and individual therapy (6F/59). Thereafter she followed up for individual therapy with a counselor approximately once every four weeks through June 2018, when she stopped attending counseling sessions (6F; 7F/2-8). She returned for medication management and counseling in February 2019, at which time she was started on Lithium (8F/14- 21).

During the relevant period, the mental status exams generally show the claimant appeared wellgroomed, cooperative, oriented, with logical thought process, good insight and judgment, sustained concentration, and normal recent and remote memory (6F/33, 47; 58-59; 7F/6). In March of 2019, the claimant reported anxiety due to her medical conditions, her husband's death, and verbal, emotional, and

physical abuse, but denied any psychiatric hospitalizations (8F 18). Throughout the period, the claimant also managed her mental health symptoms conservatively with medication. She was prescribed Cymbalta for her depressive symptoms by her primary care provider before it was changed to Wellbutrin and Melatonin when she started following with a psychiatric specialist for medication management (1F; 4F; 6F; 7F; 8F).

At the consultative psychological exam on March 24, 2021, she was friendly and cooperative; she made adequate eye contact; she appeared depressed; her speech was unremarkable; her affect was blunted; her mood was depressed; she was fully oriented; she recalled two of three objects after five minutes; she was functioning in the average intellectual range; and her insight and judgment were adequate (18F/3-4).

On March 4, 2019, she reported auditory and visual hallucinations, and on exam her mood was depressed; her affect was constricted; her judgment and insight were fair; and she was otherwise unremarkable, including adequate grooming, good hygiene, cooperative and calm behavior, full orientation, logical and organized thought process, sustained attention/concentration, and normal recent and remote memory (9F/10). On May 6, 2019, the claimant denied audio and visual hallucinations; and her exam was otherwise substantially similar (9F/29). Her exams were substantially similar, with minimal variation as to mood and affect, on September 30, 2019 (9F/48), December 5, 2019 (9F/70), January 30, 2020 (9F/92-93), April 7, 2020 (9F/123), and June 16, 2020 (20F/96). On August 12, 2022, she was fully oriented; her speech was normal; her thought process was logical and organized; her associations were tight; her judgment and insight were good; her recent and remote memory were normal; her attention and concentration were sustained; her language was appropriate; and her mood was euthymic (20F/130). On September 9, 2022, her mood was depressed and anxious, and she was otherwise unremarkable throughout (20F/138).

On September 28, 2022, she had a flat affect, a depressed mood, and fair judgment and insight, and she was otherwise unremarkable throughout (20F/158-159). On October 14, 2022, she had a euthymic mood and affect, fair judgment/insight, and she was otherwise unremarkable (20F/196). Her exam was substantially similar on November 23, 2022 (21F/28).

(ECF No. 7, PageID #: 970-75).

## IV.    The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

1. The claimant meets the insured status requirements of the Social Security Act through March 31, 2018.

2. It was previously found that the claimant is the unmarried widow of the deceased insured worker and has attained the age of 50. The claimant met the non-disability requirements for disabled widow's benefits set forth in section 202(e) of the Social Security Act.

3. The prescribed period ends on March 31, 2024.

4. The claimant has not engaged in substantial gainful activity since July 28, 2017, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

5. The claimant has the following severe impairments: carpal tunnel syndrome ("CTS"); osteoarthritis and allied disorders; degenerative disc disease of the spine; obesity; and trauma-/stressor-related disorder (20 CFR 404.1520(c) and 416.920(c)).

6. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

7. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except no operating hand controls with the right upper extremity; frequent climbing of ramps or stairs; never climbing ladders, ropes, or scaffolds; frequent stooping, kneeling, crouching, or crawling; occasional handling with the right; never have exposure to hazards (unprotected heights); limited to performing simple, routine tasks; and limited to routine workplace changes.

8. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

. . .

12. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

13. The claimant has not been under a disability, as defined in the Social Security Act, from July 28, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g))

(ECF No. 7, PageID #: 954-56, 967, 988-990)

**V. Law & Analysis**

10

### A.  Standard of Review

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

### B.  Standard for Disability

The Social Security regulations outline a five-step process that the ALJ must use in determining whether a claimant is entitled to supplemental-security income or disability-insurance benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of her residual functional capacity ("RFC"); and (5) if not, whether, based on the claimant's age,

education, and work experience, she can perform other work found in the national economy. 20

C.F.R. § 404.1520(a)(4)(i)–(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642–43 (6th Cir.

2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that she

is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has

the burden of proof in steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529

(6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the

claimant has the residual functional capacity to perform available work in the national economy.

*Id.*

### C.  Discussion

Claimant raises five issues on appeal: (1) the ALJ failed to comply with the Court's

previous order; (2) the ALJ erred at step two by failing to consider all of Claimant's impairments;

(3) the ALJ failed to properly consider whether Claimant met or equaled Listing 11.14; (4) the

ALJ failed to properly evaluate the opinion evidence; and (5) the RFC finding that Claimant could

perform light work was not supported by substantial evidence. (ECF No. 8-1 at 1).

### 1.  The ALJ complied with the Court's previous order.

In her first argument, Claimant contends that while the Court previously remanded the case

for consideration of whether she met or equaled Listing 11.14(B), the ALJ did not comply with

the order because she found that Claimant did not meet the relevant listing. (ECF No. 8-1 at 12-

13). The Commissioner responds that Claimant "contends the ALJ 'failed to comply' with the

remand order but she does not point to any provision of the remand order overlooked in the ALJ's

hearing decision, nor acknowledge key evidence cited by the ALJ in support of her finding." (ECF

No. 11 at 12).

The Court's previous order adopted the undersigned's recommendation that the

Commissioner's May 28, 2019 decision be reversed and the case be remanded for further proceedings because while the ALJ considered Listing 11.14(A), she failed to consider Listing 11.14(B). (ECF No. 7, PageID #: 1134-49). In the subsequent decision, the ALJ explicitly addressed Listing 11.14(B):

> Also, the evidence of record does not establish the necessary criteria for 11.14B, as the claimant does not have a marked limitation (see 11.00G2) in physical functioning (see 11.00G3a), and in one of the following: (1) understanding, remembering, or applying information (see 11.00G3b(i)); or (2) interacting with others (see 11.00G3b(ii)); or (3) concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or (4) adapting or managing oneself (see 11.00G3b(iv)). The claimant does not have a marked limitation in physical functioning, as demonstrated by the physical examination findings.

(*Id.* at PageID #: 957). Thus, there can be no genuine dispute that the ALJ complied with the Court's order to *consider* Listing 11.14(B). While Claimant may disagree with the ALJ's conclusion—as she does in her third argument, addressed below—she cannot show that the ALJ did not follow the Court's order. Accordingly, Claimant's first argument fails.

### 2.  The ALJ did not err in considering Claimant's diabetes.

In her second assignment of error, Claimant challenges the ALJ's conclusion that her diabetes was nonsevere and argues that "the ALJ failed to consider Plaintiff's diabetes with polyneuropathy according to Rule 14-2p." (ECF No. 8-1 at 18-19).  Claimant argues that the ALJ "failed to evaluate Plaintiff's diabetes in combination with her carpal tunnel syndrome and peripheral neuropathy" and "failed to consider any effects related to her diabetes when forming her RFC." (*Id.* at 21).

The Commissioner responds that "it is not at all the case that the ALJ 'failed to consider any effects' related to diabetes past step two as Plaintiff claims." (ECF No. 11 at 18). The Commissioner argues that Claimant "has not shown that the ALJ overlooked any particular effect of her diabetes despite finding it nonsevere" and Claimant "had 'uncontrolled' diabetes at times,

but she provides no evidence of ongoing, diabetes-related limitations arising from these episodes."

(*Id.* at 19).

At step two, the ALJ found that Claimant's diabetes was not severe, explaining:

> The claimant had elevated A1c levels throughout the relevant period (See e.g., 10F/580, 597; 20F/109). Her diabetes was characterized as "without complications, with long-term current use of insulin" (20F/187). She was also assessed with polyneuropathy due to diabetes (20F/187). The claimant's remarkable exam findings as to sensation were related to neurological impairments in her upper extremities, and she had minimal findings related to her bilateral lower extremities aside from osteoarthritis. Generally, she retained full strength and sensation and a normal, unaided gait, with respect to her lower extremities. The record does not support that the claimant has complications from diabetes mellitus that resulted in more than minimal work-related difficulties. . . .
>
> . . . The records indicate that the claimant presented at the emergency room for abdominal pain on a few occasions during the relevant period and that she treated with an endocrinologist for her diabetes, but there is no indication that these conditions caused a significant impact on her ability to perform work-like functions (7F: 8F). Thus, any limitations resulting from her diagnosed diabetes mellitus, essential hypertension, or other disorders of the gastrointestinal system, either standing alone or in combination, have no more than a minimal effect on the claimant's ability to work. These impairments are therefore not severe. (20 CFR 404.1509 and 404.1520(c)).

(ECF No. 7, PageID #: 955).

As an initial matter, the fact that the ALJ found Claimant's diabetes to be non-severe is "legally irrelevant" because she "cleared step two of the analysis" and the ALJ proceeded to consider her "severe and nonsevere impairments in the remaining steps of the sequential analysis." *Anthony v. Astrue*, 266 F. App'x 451, 457 (6th Cir. 2008) (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)). Thus, the relevant question is whether in crafting the RFC, the ALJ considered "the combined effect of all the claimant's impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." *Kochenour v. Comm'r of Soc. Sec. Admin.*, No. 3:14-CV-2451, 2015 WL 9258609, at *6 (N.D. Ohio Dec. 18, 2015) (cleaned up).

14

Here, the ALJ adequately considered the combined effects of Claimant's impairments, including her diabetes. In setting forth the applicable law, the ALJ noted that in making an RFC finding, she "must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 404.1520(e), 404.1545, 416.920(e), and 416.945; SSR 96-8p)." (ECF No. 7, PageID #: 953). At step two, the ALJ explained that "any limitations resulting from her diagnosed diabetes [and other disorders], either standing alone or in combination, have no more than a minimal effect on the claimant's ability to work." (*Id.* at PageID #: 955). Subsequently, the ALJ confirmed that she considered the entire record and "all symptoms" in drafting the RFC. (*Id.* at PageID #: 967). In similar circumstances, the Sixth Circuit has found that "[t]he ALJ's express reference to SSR 96-8p, along with her discussion of the functional limitations imposed by [Claimant's] nonsevere impairments at step two of her analysis, fully support [the] conclusion that the ALJ complied with 20 C.F.R. § 416.945(e) and SSR 96-8p." *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 852 (6th Cir. 2020). The same is true here—the ALJ's discussion of Claimant's diabetes and the lack of limitations imposed by it and her other nonsevere impairments combined with the ALJ's citation to SSR 96-8p and assurance that she considered all symptoms in drafting the RFC support that she considered the combined effect of all Claimant's impairments.

### 3. The ALJ did not err in considering whether Claimant met Listing 11.14.

Claimant argues that she "clearly had disorganization of function in her right upper extremity" as well as psychological problems such that she met Listing 11.14. (ECF No. 8-1 at 13). Claimant argues that while "the ALJ stated that the totality of [her] problems related to her problems did not satisfy the severity requirement of a Listing," "the ALJ failed to view the combination of Plaintiff's severe impairments and their combined effect on her ability to engage in substantial gainful activity on a full-time and sustained basis." (*Id.* at 23).

The Commissioner responds that "the ALJ considered the listing requirements in detail, devoting three single-spaced pages to explaining why she concluded Plaintiff met neither part of the listing's requirements." (ECF No. 11 at 13). The Commissioner argues that Claimant "has not pointed to evidence the ALJ overlooked, or which actually undermined the ALJ's weighing of the evidence." (*Id.* at 17). As to Claimant's argument that the ALJ did not consider the combination of her impairments, the Commissioner asserts that "the ALJ expressly considered the effects of each of the impairments Plaintiff cites: diabetic neuropathy, carpal tunnel syndrome, osteoarthritis, and psychological impairments." (*Id.* at 18)

Claimant replies that "[e]ven if the ALJ devoted three pages to her explanation as to why Plaintiff did not satisfy the criteria of the applicable Listing, she failed to properly evaluate the medical evidence which supported the fact that Plaintiff satisfied the criteria of the Listing." (ECF No. 12 at 1).

Listing 11.14 addresses peripheral neuropathy and can be met by satisfying all the criteria under either "part A" or "part B." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.14. To satisfy part A, a claimant must show "[d]isorganizaiton of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand from a seated position, balance while standing or walking, or use the upper extremities." *Id.* at § 11.14(A). For part B, a claimant must show that she experienced a "[m]arked limitation (11.00G2) in physical functioning" and a marked limitation in one of the following categories: "1. [u]nderstanding, remembering, or applying information (see 11.00G3b(i)); or 2. [i]nteracting with others (see 11.00G3b(ii)); or 3. [c]oncentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or 4. [a]dapting or managing oneself (see 11.00G3b(iv))." *Id.* at § 11.14(b). A "marked limitation" in physical functioning means that the claimant "is seriously limited in the ability to independently

initiate, sustain, and complete work-related physical activities." *Id.* at § 11.00G(2)(a). The regulations provide that a claimant may have a marked limitation in physical functioning when her "neurological disease process causes persistent or intermittent symptoms that affect [her] abilities to independently initiate, sustain, and complete work-related activities, such as . . . using both upper extremities for fine and gross movements, or results in limitations in using one upper and one lower extremity." *Id.*

While Claimant focuses most of her argument on the ALJ's conclusion that "her daily functioning did not support a marked, serious, or worse degree of limitation in any area of mental functioning," it is not clear that she has shown that she met the *physical* requirements of the listing. (ECF No. 8-1 at 15). Claimant only argues that she "had disorganization of function in her *right* upper extremity," not that she experienced disorganization in *both* extremities. (*Id.* at 13 (emphasis added)). The ALJ specifically noted that "[w]hile the exam findings, imaging, and testing supports some degree of limitation with respect to her right upper extremity, the record does not support significant limitations related to her left upper extremity or difficulty with standing, walking, or otherwise performing the abilities set forth in the above residual functional capacity assessment finding." (ECF No. 7, PageID #: 957). Thus, Claimant has not shown that she suffered a marked limitation in physical functioning as required to meet the listing.

Further, even if Claimant did experience a marked limitation in physical functioning, substantial evidence supports the ALJ's finding that Claimant did not have marked limitations in any of the areas of mental functioning. The ALJ provided a detailed explanation of her conclusion:

> the claimant's reported daily functioning does not support a marked, serious, or worse degree of limitation in any areas of mental functioning discussed in Listing 11.14B. The claimant noted that she is able to read about two e-books a week; (Testimony, November 17, 2022). She also noted that she has no issues with caring for her hair, shaving, feeding herself, or using the restroom; she takes care of her pets by feeding them (3E/3); she gets along "fine" with authority figures; she has

never been laid off or fired due to issues getting along with others (3E/4); she is able to get around by driving and riding in car; she gets about 3 or 4 times a week; she is able to drive; she shops for food and medications; and she is able to pay bills, count change, handle a savings account, and use a checkbook/money order (3E/8). The claimant reported that she was in regular and honors classes in school (18F/2). She has never been hospitalized for mental health issues. She has ongoing medication management but no counseling (18F/2). The claimant's mother, Rose Paull, noted that the claimant is able to shop by computer for her needs (23E/5); she interacts with others often, in person and by phone (daily) (23E/6; 34E/5); she is able to make her own food daily (34E/3); and she does not have issues with paying bills, counting change, or handling a savings account (34E/4). These reported daily activities and abilities do not support more than fair or moderate limitations in any areas of mental functioning.

The claimant's mental status examination findings do not support more than a fair or moderate degree of limitation in any areas of mental functioning as described in 11.14B. During the relevant period, the mental status exams generally show the claimant appeared well-groomed, cooperative, oriented, with logical thought process, good insight and judgment, sustained concentration, and normal recent and remote memory (6F/33, 47; 58-59; 7F/6). At the consultative psychological exam on March 24, 2021, she was friendly and cooperative; she made adequate eye contact; she appeared depressed; her speech was unremarkable; her affect was blunted; her mood was depressed; she was fully oriented; she recalled two of three objects after five minutes; she was functioning in the average intellectual range; and her insight and judgment were adequate (18F/3-4). On March 4, 2019, she reported auditory and visual hallucinations, and on exam her mood was depressed; her affect was constricted; her judgment and insight were fair; and she was otherwise unremarkable, including adequate grooming, good hygiene, cooperative and calm behavior, full orientation, logical and organized thought process, sustained attention/concentration, and normal recent and remote memory (9F/10). On May 6, 2019, the claimant denied audio and visual hallucinations; and her exam was otherwise substantially similar (9F/29). Her exams were substantially similar, with minimal variation as to mood and affect, on September 30, 2019 (9F/48), December 5, 2019 (9F/70), January 30, 2020 (9F/92-93), April 7, 2020 (9F/123), and June 16, 2020 (20F/96). On August 12, 2022, she was fully oriented; her speech was normal; her thought process was logical and organized; her associations were tight; her judgment and insight were good; her recent and remote memory were normal; her attention and concentration were sustained; her language was appropriate; and her mood was euthymic (20F/130). On September 9, 2022, her mood was depressed and anxious, and she was otherwise unremarkable throughout (20F/138). On September 28, 2022, she had a flat affect, a depressed mood, and fair judgment and insight, and she was otherwise unremarkable throughout (20F/158-159). On October 14, 2022, she had a euthymic mood and affect, fair judgment/insight, and she was otherwise unremarkable (20F/196). Her exam was substantially similar on November 23, 2022 (21F/28). While these examinations show some degree of impairment, they do not show a marked or serious degree of

difficulty in any areas of functioning as described in 11.14B. The state agency psychological consultants on the initial application opined that the claimant has mild limitations in interacting with others; and moderate limitations in the other three areas of mental functioning (1A/9; 2A/9; 5A/7; 6A/7). On the refiled claims, the state agency psychological consultants found moderate limitations understanding, remembering, or applying information; and adapting or managing oneself in the other areas of mental functioning (16A/4; 17A/4-5; 18A; 19A). They further noted that the claimant is limited to performing simple, routine tasks; and limited to routine workplace changes (16A/6; 17A/4-5; 18A; 19A). These opinions do not endorse marked limitations in any criteria set forth in Listing 11.14B. Accordingly, the evidence of record does not satisfy the necessary criteria of Listing 11.14.

(ECF No. 7, PageID #: 958-59). The records cited by the ALJ in her analysis amount to substantial evidence to support that Claimant did not have a marked limitation in any of the relevant areas of mental functioning. To the extent Claimant points to evidence that would have supported a different conclusion, such is not sufficient to disturb the ALJ's finding. Rather, so long as substantial evidence supports the ALJ's decision, the Court must defer to it, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).

### 4. The ALJ did not err in her treatment of various opinions.

Claimant's fourth assignment of error challenges the ALJ's treatment of opinions from Dr. David Anthony, Dr. Deborah Koricke, and the State agency reviewers. (ECF No. 8-1 at 25-29).

For claims filed after March 27, 2017, the regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." 20 C.F.R. § 404.1520c(a). Nevertheless, an ALJ must "articulate how [he] considered the medical opinions and prior administrative medical findings" in adjudicating a claim. *Id.* Medical source opinions are evaluated using the factors listed in § 404.1520c(c). The factors include supportability; consistency; the source's relationship with the claimant; the source's specialized area of practice,

if any; and "other factors that tend to support or contradict a medical opinion." *Id.* at §
404.1520c(c).  The ALJ is required to explain how he considered the supportability and
consistency of a source's medical opinion(s), but generally is not required to discuss other factors.
*Id.* at § 404.1520c(b)(2). Under the regulations, "[t]he more relevant the objective medical
evidence and supporting explanations presented by a medical source are to support his or her
medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical
opinions or prior administrative medical finding(s) will be" and "[t]he more consistent a medical
opinion(s) or prior administrative medical finding(s) is with the evidence from other medical
sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior
administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c).

### a. Dr. David Anthony

Claimant argues that "contrary to the ALJ's erroneous and unsupported analysis, the
opinion of Dr. Anthony was supported by and consistent with the medical evidence in this matter."
(ECF No. 8-1 at 28). The Commissioner responds that the ALJ explained why she found Dr.
Anthony's opinion both unsupported by and inconsistent with the record and Claimant's challenge
is essentially a request that the Court reweigh the evidence in her favor. (ECF No. 11 at 20-21).

The ALJ summarized Dr. Anthony's opinion and her treatment of it:

I find not persuasive the opinion of the Donald Anthony, M.D., the claimant's
rheumatologist, dated April 4, 2023(22F). He opined that she is limited to sitting
for 2 hours at one time; standing for 30 minutes at one time; sitting a total of 4
hours; standing/walking of less than 2 hours; she needs unscheduled breaks; she
needs a cane; she can occasionally lift less than 10 pounds and never more; she has
"significant limitations" with reaching, handling, or fingering; she would be off-
task 20% of the day; she is capable of low stress work; her medication inhibits "long
concentration tasks"; and she has good and bad days (22F/4-8). The opinion is not
persuasive because the more complete record is inconsistent with his opined
limitations on standing, walking, sitting, lifting, off-task behavior, and use of a

cane. Also, portions of the opinion are vague as to how her medication impacts her ability to perform "long concentration tasks", what "good days and bad days" are and how to quantify them, and explaining what is "low stress work". The lack of specificity and clarity renders these portions of little use in assessing the claimant's functional limitations.

His own exam note from April 6, 2023, shows some mild tenderness in the lumbosacral spine; low grade general tenderness in the wrists, hands, and fingers; no synovitis in the hands; bony enlargement in the hands and in the first MTP bilaterally (feet); some reduced hand grasp strength (no rating); good range of motion in the hips and feet; negative straight leg raise testing; normal reflexes in the bilateral lower extremities; intact sensation in the bilateral lower extremities; some reduced range of motion in the shoulders; and full strength (5/5) in the lower extremities (22F/10-11). He noted that EMG testing in 2021 showed bilateral wrist CTS; imaging of her foot from February of 2023, showed degenerative changes in the 1st MTP of the right foot; and degenerative changes in the lumbar spine at multiple levels (22F/3).

The record does not show a significant amount of examinations by Dr. Anthony. At video consultation on April 7, 2022, he did not examine the claimant (19F/74-76). At an in-person exam on October 28, 2021, she had limited active range of motion in the right shoulder with abduction; she had bilateral MCP and PIP distribution tenderness but no active synovitis; she had no tenderness or swelling in the bilateral MTP and IP, except for the 1st MP bilaterally; she had right thenar muscle group weakness; she had left mild weakness; and she had positive Tinel's sign on the right (19F/100). He noted the same findings on May 27, 2021 (19F/117). He also noted the same findings on July 8, 2021, but it was not an in-person consultation and he did examine the claimant (19F/114). It is difficulty to reconcile Dr. Anthony's exam findings showing "low grade" tenderness in the hands, wrists, and fingers, some mild tenderness in the lumbosacral spine, some reduced range of motion in the shoulders, and some reduced hand strength, and otherwise unremarkable examination showing full strength (5/5 in the lower extremities), sensation, reflexes, and range of motion and the recited imaging and testing, with the relatively extreme limitations as to standing, walking, sitting, off-task behavior, or the need for a cane to which he opined.

Also, contrary to his opinion, there is no mention of a prescription for a cane or other ambulatory aid, or notations of cane or ambulatory aid use throughout the record. In fact, her gait was consistently noted as within normal limits and "steady" (9F/10 (02/22/19); 9F/29, 49, 70, 93; 10F/9, 28, 94, 261, 280). Again, this evidence is inconsistent with Dr. Anthony's opinion regarding cane use.

Moreover, with little exception, her physical exam findings throughout the record do not include finding that would support that the claimant is so limited. While the exam findings, imaging, and testing supports some degree of limitation with respect to her right upper extremity, the record does not support significant limitations

related to her left upper extremity or difficulty with standing, walking, or otherwise performing the abilities set forth in the above residual functional capacity assessment finding. In September of 2018, she had full flexion range of motion in her fingers and thumb. She was diagnosed with right hand ulnar sided numbness and pain, clinically referred to as ulnar neuropathy; right thumb osteoarthritis: right de Quervain's tenosynovitis; and right carpal tunnel syndrome (7F/74). EMG testing on November 19, 2018 showed evidence of right median sensorimotor mononeuropathy at or distal to the wrist, moderate severity with demyelination in nature; and there was no electrodiagnostic evidence of right ulnar mononeuropathy at the elbow or wrist, or of right cervical radiculopathy (7F/123). Comparatively, the records also show that there was no electrodiagnostic evidence of left carpal tunnel syndrome, left ulnar mononeuropathy or left cervical radiculopathy in November 2018 (7F/123). Thus, CTS was indicated by EMG testing in the right upper extremity and not the left.

The record reflects some osteoarthritis in both upper and lower extremities. Imaging of the claimant's fingers from September of 2019 showed mild to moderate degenerative joint disease in the CMC of the left hand (10F/464-465). Imaging of her right hand from September of 2019 showed early osteoarthritic changes in the 1st CMC joint (10F/462-464). Imaging of her feet from May of 2021, showed degenerative changes and heel spur. Imaging of her hands/wrists from that time was unremarkable (22F/11). Imaging of her feet from February of 2023, showed bilateral foot calcaneal spurring. Within the context of this imaging, the claimant's physical exams do not suggest that she is incapable of light exertion, with limitations on climbing, postural activities, and use of her right upper extremity for handling and hand controls, as set forth in the above residual functional capacity assessment.

At exam on March 4, 2019, she had no tenderness throughout; there were no focal deficits; and a podiatric exam was unremarkable bilaterally (10F/157). On April 19, 2019, her extremities were unremarkable (10F/147). On June 10, 2019, her exam was unremarkable, including normal sensation to monofilament testing on the feet and with 2+ pulses present (10F/133). On July 4, 2019, she had full range of motion in all four extremities; and she had normal pulses throughout (10F/126). Aside from some abdominal tenderness, her exam was similarly unremarkable on July 18, 2019 (10F/120-121). Her exam was unremarkable October 7, 2019 (10F/89). At exam on September 20, 2019, she had diffused finger and hand tenderness; her range of motion in the wrists and hands was normal; her sensation was decreased in the radial 4 digits; she had positive Tine's and Durkan's signs bilaterally; she had mild 4/5 thenar atrophy; her intrinsic motor strength was 5/5, with no atrophy; and her neck range of motion was 75% (10F/104). At a podiatric exam on March 3, 2020, she had reduced dorsalis pedis pulses at 1+ bilaterally, but she was otherwise unremarkable as to sensation and there were no gross motor deficits (10F/16). On May 21, 2020, her gait was steady; her sensation and strength were symmetric and appropriate; she had full range of motion in all four extremities; and she had no edema (10F/9). At the consultative psychological exam on March 24, 2021, she

walked into the room with an unremarkable gait and without any assistive device; and she wore braces on both wrists(18F/2- 4). On October 13, 2022, she had swelling and tenderness in the hands and fingers, but normal range of motion; and she had no focal deficits (20F/188-189). On October 31, 2022, her sensation was intact bilaterally, with the exception of diminished vibratory sensation bilaterally; she had normal muscle strength with dorsiflexion; she had some limited range of motion in the 1 st MPT joint due to pain and crepitus; and she otherwise had full range of motion without pain or crepitus bilaterally in the lower extremities (21F/62). On January 23, 2023, she had normal range of motion throughout; she had no focal deficits; and her breathing and cardiovascular signs were unremarkable (21F/21).

(ECF No. 7, PageID #: 985-88).

This discussion clearly establishes that the ALJ considered the relevant supportability and consistency factors. As to supportability, the ALJ found that Dr. Anthony's opinion was not supported by his own "exam findings showing 'low grade' tenderness in the hands, wrists, and fingers, some mild tenderness in the lumbosacral spine, some reduced range of motion in the shoulders, and some reduced hand strength, and otherwise unremarkable examination showing full strength . . . , sensation, reflexes, and range of motion and the recited imaging and testing." (*Id.* at PageID #: 986). The ALJ also addressed consistency, noting that "with little exception, [Claimant's] physical exam findings throughout the record do not include finding that would support that the claimant is so limited." (*Id.* at PageID #: 987). Substantial evidence, as cited by the ALJ, supports this conclusion. Accordingly, the Court must defer to the ALJ's conclusion. *Wright*, 321 F.3d at 614.

### b.  Dr. Deborah Koricke

Claimant next challenges the ALJ's treatment of Dr. Deborah Koricke's opinions, arguing that the ALJ found that the "opinions were based largely on Plaintiff's subjective reports and so were not persuasive," but "the treatment records supported and were consistent with the findings of Dr. Koricke" such that the ALJ's failure to include her opined limitations rendered the RFC

unsupported by substantial evidence. (ECF No. 8-1 at 28-29). The Commissioner responds that

Claimant's argument "should be rejected because it 'rests solely on the weight to be given

opposing medical opinions, which is clearly not a basis for our setting aside the ALJ's factual

findings." (ECF No. 11 at 22) (quoting *Mullins v. Sec'y of Health & Hum. Servs.*, 836 F.2d 980,

984 (6th Cir. 1987)). The Commissioner argues that substantial evidence supports the ALJ's

treatment of Dr. Koricke's opinion. (*Id.* at 23).

The ALJ summarized Dr. Koricke's opinions and how she considered them in formulating

the RFC:

> I also read and considered the opinions in the report from the consultative
> evaluation with Deborah Koricke, Ph.D., dated February 7, 2018, and the
> supplement dated April 11, 2018 (4F; 5F). After a mental status examination, Dr.
> Koricke diagnosed the claimant with adjustment disorder with mixed anxiety and
> depressed mood (4F/5). Dr. Koricke opined that the claimant would have great
> difficulty remembering instructions especially detailed or complex instructions
> (4F/5). Dr. Koricke also noted the claimant had poor concentration throughout the
> evaluation, and while she did not exhibit or report any difficulties with behavior
> interacting with others, Dr. Koricke opined that her concentration problems would
> frustrate others in a workplace environment (4F/5-6). Finally, with regard to
> responding appropriately to work pressures, Dr. Koricke opined the claimant would
> have difficulty responding to work pressures on a full-time basis due, at least in
> part, to concentration issues and emotional issues related to depression and anxiety
> (4F/6). Overall, I do not find these opinions as to the claimant's mental limitations
> to be persuasive. Dr. Koricke's opinions are based largely on the claimant's
> subjective reports and the level of limitation suggested is not supported by the very
> conservative course of mental health treatment.

(ECF No. 7, PageID #: 983).

Based on this discussion, the ALJ adequately addressed the supportability and consistency

factors. The ALJ found that the opinions were unsupported given that they were based largely on

Claimant's subjective complaints. *See Owens v. Comm'r of Soc. Sec.*, No. 3:20-CV-01737-JJH,

2021 WL 8342841, at *6 (N.D. Ohio Sept. 15, 2021), *report & recommendation adopted*, 2023

WL 6283030 (N.D. Ohio Sept. 27, 2023) ("While the ALJ did not use the term 'supportability' in

his evaluation, it is clear that the ALJ's finding that [an] opinion was based heavily on Claimant's subjective complaints is a finding that the opinion lacked the support of objective evidence."). "[T]he Sixth Circuit has repeatedly upheld an ALJ's decision to discount a treating physician's opinion that appears to be based on a claimant's subjective complaints, without sufficient support from objective medical data." *Warner-Grunau v. Comm'r of Soc. Sec.*, No. 1:21-CV-00415, 2023 WL 2264263, at *17 (N.D. Ohio Feb. 28, 2023) (collecting cases). As to consistency, the ALJ concluded that the level of limitation in Dr. Koricke's opinions was "not supported by the very conservative course of mental health treatment." (ECF No. 7, PageID #: 983). As noted by the ALJ earlier in the opinion, Claimant "managed her mental health symptoms conservatively with medication" and records indicated she generally presented with fair judgment and insight, adequate grooming, cooperative and calm behavior, full orientation, logical and organized thought process, and sustained attention and concentration. (*Id.* at PageID #: 974-75).

Thus, the ALJ complied with the regulations by considering the supportability and consistency factors in finding Dr. Koricke's opinions unpersuasive and substantial evidence supports this decision.

### c. **State agency reviewers**

Claimant argues that the "ALJ based her RFC on the opinions of the State Agency reviewing physicians" and "also found that the opinions of the reviewing psychologists were also persuasive" but "these opinions were proffered in January and July 2018, prior to the submission of much of the evidence in this matter." (ECF No. 8-1 at 29). Claimant argues that the ALJ "failed to acknowledge the objective testing and treatment which supported Plaintiff's symptoms." (*Id.* at 30). The Commissioner responds that "all four of the prior administrative medical findings were issued during the relevant period" and Claimant "omits the prior administrative medical findings

by Dr. Dietz and Dr. Johnston—from 2020 and 2021, which the ALJ also found persuasive." (ECF No. 11 at 24).

To the extent Claimant asserts that the ALJ based the RFC *only* on the 2018 State agency opinions without consideration of the subsequent medical evidence, such argument fails. While the ALJ did find the 2018 opinions persuasive, she also found persuasive State agency opinions issued in 2020 and 2021, which assessed the same RFC even after review of the subsequent medical evidence. (*See* ECF No. 7, PageID #: 983-85). Additionally, to the extent Claimant's argument is that the ALJ should not have relied on the 2018 opinions because the reviewers had not reviewed all her medical records, "it is not error for an ALJ to rely on medical opinions from physicians who have not reviewed the entire record so long as the ALJ considers the post-dated evidence in formulating her opinion." *Edwards v. Comm'r of Soc. Sec.*, No. 1:17 CV 925, 2018 WL 4206920, at *6 (N.D. Ohio Sept. 4. 2018) (*citing McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (indicating that an ALJ's reliance upon state agency reviewing physicians' opinions that were outdated was not error where the ALJ considered the evidence developed post-dating those opinions)). Here, the ALJ's discussion of the medical history make clear that she considered the evidence submitted after the 2018 opinions. (*See* ECF No. 7, PageID #: 970-75). Accordingly, the ALJ did not err in relying on the 2018 State agency opinions.

**5.   The ALJ did not err in concluding Claimant could perform light work.**

In her final argument, Claimant argues that "[b]ased on the combination of [her] problems limiting her to standing/walking less than the requisite 6 hours as required for work at the light level of exertion combined with her documented problems using her dominant right upper extremity, the ALJ's determination that she could perform work at that level of exertion was not supported by substantial evidence." (ECF No. 8-1 at 32).

This argument appears to be nothing more than a request that the Court reweigh the evidence in Claimant's favor. But it is not the role of this Court "to reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)). The ALJ provided a detailed discussion of Claimant's allegations as well as the medical evidence of both physical and mental impairments. (ECF No. 7, PageID #: 968-75). The ALJ then proceeded to explain why she found Claimant's allegations were not entirely consistent with the record, citing Claimant's daily activities, the medical records, and the State agency opinions finding she was able to perform a reduced range of light work. (*Id.* at PageID #: 975-80). Thus, substantial evidence supports the ALJ's decision. *See Sittinger v. Comm'r of Soc. Sec.*, No. 1:22-CV-01927-BYP, 2023 WL 6219412, at *13 (N.D. Ohio Sept. 7, 2023) ("An RFC determination that is supported by the medical opinions of state agency physicians is generally supported by substantial evidence."), *report & recommendation adopted sub nom.*, 2023 WL 6214530 (N.D. Ohio Sept. 25, 2023); *see also Maldonado o/b/o A.C. v. Kijakazi*, No. 4:20-CV-1878, 2022 WL 361038, at *6 (N.D. Ohio Jan. 14, 2022) ("There is ample case law concluding that State Agency medical consultative opinions may constitute substantial evidence supporting an ALJ's decision.") (collecting cases), *report & recommendation adopted sub nom.*, 2022 WL 356557 (N.D. Ohio Feb. 7, 2022). Accordingly, the ALJ's decision must be affirmed, even "if substantial evidence also supports the claimant's position." *Quarterman v. Comm'r of Soc. Sec.*, No. 4:23 CV 503, 2024 WL 1067044, at *1 (N.D. Ohio Mar. 12, 2024) (citing *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)).

**VI. Recommendation**

27

Based on the foregoing, it is RECOMMENDED that the Court OVERRULE Claimant's

Statement of Errors and AFFIRM the Commissioner's decision.

 Dated: April 3, 2024

s/ *Carmen E. Henderson*
CARMEN E. HENDERSON
U.S. MAGISTRATE JUDGE

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F. 3d 520, 530-31 (6th Cir. 2019).